**Opinion issued August 5, 2021**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-19-00642-CV

———————————

**JAMES J. MCKINLEY AND KIN-TEK LABORATORIES, INC., Appellants**

**V.**

**KIN-TEK ANALYTICAL, INC., Appellee**

---

**On Appeal from the 122nd District Court**
**Galveston County, Texas**
**Trial Court Case No. 17-CV-1218**

---

## MEMORANDUM OPINION

Appellants, James J. McKinley and Kin-Tek Laboratories, Inc. ("McKinley" and "Laboratories" or, collectively, "appellants"), appeal from a final judgment entered following a jury verdict in favor of appellee Kin-Tek Analytical, Inc.

("Analytical"). In nine issues, appellants challenge the jury's damages and attorney's fees awards. We affirm.

## Background

McKinley founded Laboratories in 1970 and ran the company for decades as its sole owner. Laboratories sold, manufactured, and supported chemical calibration devices, including permeation tubes and calibration gas standard generators. The calibration gas standard generators hold permeation tubes at a certain temperature, which allows the permeation tubes to create a gas customers use to calibrate their chemical analyzers, detectors, monitors, and other similar instruments. Laboratories also made and sold standardized instruments, including calibration devices for about 600 different chemicals that can be customized to meet the customer's particular need.

Around 2011 or 2012, Laboratories "went into a decline." McKinley reached out to William Botts, whom McKinley had known for over 20 years, for help. Botts worked part-time as a consultant to help Laboratories find potential investors. Initially, Botts was paid a fee, but he later worked for free when Laboratories was no longer able to pay him.

In 2013, McKinley approached Botts about Botts either buying or investing in Laboratories himself. Botts and McKinley signed a Letter of Intent ("LOI"), which contemplated the formation of a new company that would "purchase all the

2

assets and assume certain liabilities of [Laboratories]," as opposed to a personal investment by Botts. Ultimately, the parties signed an Asset Purchase Agreement (the "Agreement") on February 14, 2014, whereby the new company, Analytical, acquired Laboratories' assets. The parties structured the deal as an asset purchase, meaning the purchase price for Laboratories' assets reflected its working capital. As Laboratories' working capital declined throughout negotiations, so did the purchase price. The final purchase price in the Agreement was $50,000, which included $36,564.92 in cash that Laboratories was allowed to keep and a cash payment of $13,435.08 made by Analytical to Laboratories.

Botts holds 60 percent of Analytical's shares, and McKinley holds the remaining 40 percent. Under the Agreement, Analytical acquired all of Laboratories' assets (except McKinley's personal effects), but Analytical assumed only certain liabilities specifically enumerated in the Agreement.

In October 2017, McKinley sued Botts and Analytical, alleging that Botts was mismanaging Analytical and bringing causes of action for breach of contract, conspiracy, tortious interference, and breach of fiduciary duty. Botts and Analytical filed counterclaims against McKinley and third-party claims against Laboratories, alleging that they breached the Agreement by making inaccurate representations and warranties, failed to perform contractual duties, and failed to discharge liabilities they retained under the Agreement. Botts and Analytical also alleged that they were

fraudulently induced by McKinley and Laboratories to execute the Agreement. McKinley and Laboratories filed an amended petition, adding Laboratories as a plaintiff, adding a cause of action for fraudulent inducement, and dropping their cause of action for tortious interference.

In March 2019, shortly before trial, McKinley and Laboratories nonsuited their claims against Botts and Analytical. The trial court realigned the parties to designate Botts and Analytical as plaintiffs. At some point before trial, Botts nonsuited his personal claims against McKinley and Laboratories, and the case proceeded to trial on Analytical's claims.[1]

The jury returned a verdict in favor of Analytical, finding that both McKinley and Laboratories "fail[ed] to comply with the Agreement." The jury awarded Analytical a total of $274,134.41 in damages and $193,067.82 in attorney's fees. Specifically, as damages, the jury awarded:

- $16,437.93 for "[l]osses arising from uncollectable receivables"
- $57,138.12 for "[l]osses arising from obsolete or excess inventory"
- $26,525.34 for "[l]osses arising from liabilities for unused employee vacation"
- $25,000 for "[l]osses arising from liabilities for product warranty costs"

---

[1] Though a notice of nonsuit of Botts's claims is not included in the clerk's record, the trial court's jury charge and judgment identify Analytical as the only plaintiff and only award damages only to Analytical.

4

- $17,550 for "[l]osses arising from product documentation issues"

- $33,439 for "[l]osses arising from product design issues"

- $41,559 for "[l]osses arising from failure to disclose material facts"

- $45,985 for "[l]osses arising from obsolete or malfunctioning equipment"

- $10,500 for "[l]osses arising from failure to remove hazardous materials"

McKinley and Laboratories moved for judgment notwithstanding the verdict ("JNOV"). The trial court denied the JNOV motion and entered a final judgment in Analytical's favor. This appeal followed.[2]

## Excluded Liabilities

In their first issue, appellants argue that, as a matter of law, Analytical is not entitled to recover $125,101.39 in damages for "Excluded Liabilities," including uncollectable receivables, obsolete or excess inventory, unused employee vacation, and product warranty costs. In their second related issue, appellants argue that the evidence is legally and factually insufficient to support these damages because Botts knew or should have known the amount of these items before signing the Agreement.

---

[2]    McKinley timely filed a notice of appeal. The notice of appeal was amended to include Laboratories as an additional appellant before the appellants' brief was filed. *See* TEX. R. APP. P. 25.1(g).

## A. Standard of Review and Applicable Law

In a legal-sufficiency review, we consider the evidence in a light most favorable to the jury's verdict, indulging every reasonable inference that would support it, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Republic Petroleum LLC v. Dynamic Offshore Res. NS LLC*, 474 S.W.3d 424, 433 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). We sustain a legal-sufficiency challenge only when: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Regal Fin. Co. v. Tex Star Motors, Inc.*, 355 S.W.3d 595, 603 (Tex. 2010) (citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). We defer to the jury's determination of the witnesses' credibility and the weight to accord their testimony. *City of Keller*, 168 S.W.3d at 819; *Republic Petroleum*, 474 S.W.3d at 433.

In a factual-sufficiency review, we consider all the evidence in a neutral light and set aside the jury's verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Republic Petroleum*, 474 S.W.3d at 433. Jurors are entitled to

resolve inconsistencies in witness testimony, whether those inconsistencies result from the contradictory accounts of multiple witnesses or from internal contradictions in the testimony of a single witness. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986); *Republic Petroleum*, 474 S.W.3d at 433.

We construe contracts as a matter of law, absent ambiguity. *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 7 (Tex. 2014). Our primary concern is to ascertain and give effect to the parties' true intentions as expressed in the agreement. *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 805 (Tex. 2012). "We consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement." *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam). "No single provision taken alone will be given controlling effect[.]" *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). We give contract terms their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005).

Unless the court finds a contract ambiguous, a contract's meaning and intent is determined from the four corners of the document without the aid of extrinsic evidence. *Chapman v. Hootman*, 999 S.W.2d 118, 123 (Tex. App.—Houston [14th Dist.] 1999, no pet.). A contract is ambiguous when it is reasonably susceptible to

7

more than one meaning. *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co.*, 341 S.W.3d 323, 333 (Tex. 2011). A lack of clarity or disagreement over the interpretation of contract language does not make a contract ambiguous. *Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 746 (Tex. 2003).

## B.     Analysis

Under Article 4 of the Agreement, Analytical agreed to "assume[,] pay, satisfy, discharge, perform and fulfill . . . certain obligations and liabilities of [Laboratories] described on the attached Exhibit B." The Agreement also provided that no other liabilities, other than those described in Exhibit B, would be assumed by Analytical. It stated that:

> [Analytical] expressly disclaim[ed] responsibility for . . . any and all Losses and obligations . . . except those items in Exhibit B and *not to exceed the amounts set beside each item*. All other liabilities not identified and/or expressly cited in Exhibit B Assumed Liabilities are expressly disclaimed by [Analytical] and [Analytical] shall not be responsible for, and shall not assume nor be obligated to pay, perform or discharge any liabilities of [Laboratories].

(Emphasis added.) Further, McKinley and Laboratories agreed to indemnify Analytical for their failure to satisfy any liability or obligation other than those Assumed Liabilities described in Exhibit B.

Exhibit B to the Agreement set forth the specific liabilities Analytical agreed to assume, stating that "[l]iabilities not Included on Seller Financial Statements as listed below will be assumed *up to the amounts set beside each below*:"

-Uncollectable Accounts Receivable    No estimate provided
-Product Warranties                   No estimate provided
-Employee Vacation Unused             No estimate provided
-Obsolete and Excess Inventory        No estimate provided

(Emphasis added.) Exhibit B then provided that "[a]ny amounts exceeding the estimate set forth above shall be the responsibility of [McKinley] and [Laboratories] and shall be Excluded Liabilities."

Both sides argue that this provision is unambiguous, but they offer a different interpretation. According to appellants, although Exhibit B includes provisions for "Excluded Liabilities," those provisions "are only for amounts above Exhibit B's stated amounts." Appellants argue that any damage award for the four categories above—what appellants call the Excluded Liabilities—is contrary to the plain language of the Agreement because the parties chose not to include a specific dollar amount for these categories. Stated another way, because the contract did not include a specific dollar amount for these four categories, Analytical assumed liability for any and all amounts related to these four categories. In contrast, Analytical argues that it assumed no liability at all because the Agreement states "No estimate

9

provided" for each of these four categories and because no amount was "set beside each below."

Reading all parts of the Agreement together and giving effect to each word, clause, and sentence, as we must, we agree with Analytical. We conclude that although Analytical expressly agreed to assume liability for uncollectable accounts receivable, product warranties, unused employee vacation, and obsolete and excess inventory, it did so *limiting* its liability to the amounts expressly stated in Exhibit B. Because there was no amount set beside these categories, McKinley and Laboratories retained all liability for these four categories as articulated in Exhibit B and as found by the jury.

In Article 4 and Exhibit B of the Agreement, Analytical expressly disclaimed any and all liabilities not specifically set forth in Exhibit B and expressly stated that it was assuming the liabilities set forth in Exhibit B only up to the amounts stated beside each category. The plain meaning of this language indicates that the estimate provided would be the upper limit of what Analytical would be responsible for paying, i.e., it would assume liability in an amount less than or equal to, but no more than, the estimated amount. *See Up to*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY, (11th ed. 2020) ("used as a function word to indicate a limit or boundary"); *see also Up to*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/up-to, last visited July 22,

10

2021 ("used to say that something is less than or equal to but not more than a stated value, number, or level" ). Because "[n]o estimate [was] provided," however, there was no "amount set beside each" category and, therefore, Analytical did not assume any amount. This is the only reasonable interpretation because it takes into account the language in the Agreement that Analytical was assuming only certain liabilities expressly included, and only for certain amounts explicitly stated. Anything else not expressly disclosed was to be an Excluded Liability.

In reaching this conclusion, we are unpersuaded by appellants' contention that Analytical should have known the amounts for these four categories because Botts "had full access to Laboratories accounting records prior to signing the Agreement" and, therefore, Analytical assumed these liabilities in any and all amounts. That Botts arguably could have determined the estimated amounts for these four categories—an issue we do not decide—does not change the language of the Agreement, which explicitly limited the Assumed Liabilities to those "amounts set beside each" specific category set forth in Exhibit B. And appellants cite to no authority to support their contention that their characterization of Botts as an "insider" and "experienced corporate savior" would affect this Court's interpretation of this unambiguous Agreement.

We conclude that for uncollectable receivables, product warranty costs, unused employee vacation, or obsolete or excess inventory, the amount that

11

Analytical assumed liability for was zero, and that any amounts above zero for these liabilities were Excluded Liabilities under the Agreement.

Furthermore, to the extent that appellants' second issue can be construed as challenging the sufficiency of the evidence supporting the jury's findings awarding Analytical $16,437 for uncollectable accounts receivable, $57,138.12 for product warranties, $26,525.34 for unused employee vacation, and $25,000 for obsolete and excess inventory, we conclude there is legally and factually sufficient evidence to support these findings. Botts testified that the amounts for these items should have been included in Laboratories' financial statements but were not.

After the Agreement was executed, Analytical filed an IRS Form 8594, which is a form that must be filed after the sale or purchase of a business. This form must be filed by both parties to the transaction, as it is "a reflection of their agreement for the transaction involved." Analytical introduced the Form 8594, as Plaintiff's Exhibit 12, that it filed after executing the Agreement based on information provided by its accountant Doug Dickie, and Botts testified that McKinley agreed to the amounts reflected in Exhibit 12. Analytical's Form 8594 reflected a total amount of assets purchased (or purchase price) of $284,552, the same amount of liabilities assumed. Included in that total amount of liabilities was $16,437 for uncollectable accounts receivable, $57,138.12 for product warranties, $26,525.34 for unused employee vacation, and $25,000 for obsolete and excess inventory.

Considering the evidence in a light most favorable to the jury's findings and indulging every reasonable inference to support them, we conclude there is legally sufficient evidence to support the jury's total award of $125,101.39 in damages for uncollectable accounts receivable, product warranties, unused employee vacation, and obsolete and excess inventory. *See City of Keller*, 168 S.W.3d at 827. Likewise, we conclude that the jury's findings are not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust and, therefore, there is factually sufficient evidence to support the jury's damages. *See Cain*, 709 S.W.2d at 176.

We overrule appellants' first and second issues.

### Sufficiency of the Evidence of Other Damages

In their third, fourth, fifth, sixth, and seventh issues, appellants challenge the legal and factual sufficiency of the evidence supporting the jury's findings awarding damages for product documentation issues, product design issues, failure to disclose material facts, obsolete equipment, and failure to remove hazardous materials. Applying the legal- and factual-sufficiency standards set out above, we address each issue in turn.

**A.      Product Documentation Issues**

In their third issue, appellants contend there was legally and factually insufficient evidence to support the jury's finding that $17,550 would fairly and reasonably compensate Analytical for its damages that resulted from product

13

documentation issues. They argue that Botts never testified why "Laboratories could somehow make these products or use these systems, but Analytical could not do so." And they contend that there was no evidence that a product documentation issue existed at the time of the Agreement. Therefore, appellants urge this Court to strike the $17,550 damages for product documentation issues.

McKinley and Laboratories represented and warranted in Article 5(AC) of the Agreement that:

> each product has adequate manufacturing documentation, including drawings, specifications, manufacturing process descriptions, bill of material, assembly instruction and test procedure so that a worker of average skill in manufacturing will be able to assemble and test such product to conform with published specifications.

Botts explained that having proper product documentation was important because Analytical makes "technical products" that "people use to calibrate their devices." Many of these products have a number of different component parts that must "fit [and] function together," which makes it "critically important that documentation is available to make all of these products." Botts further testified that he would not have been able to discover all the issues related to product documentation during the due-diligence process because "[y]ou really find out when you make the product." Botts testified that although it was "certainly possible" to hire a consultant during the due-diligence process to ensure that everything was correct, it would have been "cost prohibitive" due to the number of products made and chemicals used by

14

Laboratories. "It would have cost more to do the due diligence than it did to buy the company." Instead, he spoke to McKinley to confirm there was adequate product documentation and relied on McKinley's representations that there was.

Botts testified, however, that the representation related to adequate product documentation contained in the Agreement was not true, and that Analytical incurred $17,550 in costs "relating to information that was not available regarding equipment . . ., how to operate the equipment, and product information documentation." Specifically, Botts testified to product documentation issues related to six systems or pieces of equipment—the permeation cylinder, the quote system, the gauge system, solenoid brackets, Span Pac/H20 Silk Screen, and the heater oven.

Contrary to appellants' assertion, Botts did testify as to why Analytical could not make these products or use these systems. With respect to these items, Botts testified that the product documentation and information was either incorrect (for the permeation cylinder and quote system), missing entirely (for the gauge system, solenoid brackets, and Span Pac/H20 Silk Screen), or incomplete (for the heater oven). Finally, and despite appellants' assertion to the contrary, Botts testified that these issues did not arise in the years after the Agreement but were present at the time the parties entered into the Agreement.

Considering the evidence in a light most favorable to the jury's finding and indulging every reasonable inference to support it, we conclude there is legally

sufficient evidence to support the award of $17,550 for product documentation issues. *See City of Keller*, 168 S.W.3d at 827. Likewise, we conclude that the jury's finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust and, therefore, there is factually sufficient evidence to support the award of $17,550 for product documentation issues. *See Cain*, 709 S.W.2d at 176.

We overrule appellants' third issue.

## B.    Product Design Issues

In their fourth issue, appellants contend there was legally and factually insufficient evidence to support the jury's finding that $33,439 would fairly and reasonably compensate Analytical for its damages that resulted from product design issues related to the HG10 Liter Humidification Module. Appellants argue that the evidence does not establish that any product design issues existed at the time of the Agreement, nor does the evidence establish that there was a "HG10 product line wide flaw," only that one customer had a problem with its product.

McKinley and Laboratories represented and warranted in Article 5(AC) of the Agreement that:

> all product designs are free of defects which would prevent products manufactured therefrom from properly performing, functioning, and complying with published specifications and representations as to such products made in any publication by [Laboratories], including sales brochures and other marketing materials, etc.

Two witnesses testified for Analytical on the design issues associated with the HG10 Liter Humidification Module ("HG10"): Botts and Danet Vrazel, vice president and general manager of Analytical. Botts testified that McKinley's and Laboratories' representation that all product designs were free from defects was important because a "product will not work if it has defects in it. And if it works some, it may not have long-term reliability." He admitted that he was neither a chemist nor a design engineer and that he would not have been able to tell if a defect existed in a product during the due-diligence process because "[y]ou really only find out when you make the product." Botts testified that appellants' representations that the products were free from design defects was not true because the product design for the HG10 was defective. He explained that the HG10, in layman's terms, was designed to "create a humidity that will have a calibration standard," or stated another way, to create an "air sample that has a certain amount of humidity in it." He testified that an issue arose when Analytical sold the HG10 to a customer and that customer reported back that the product was not working properly. As a result, and at McKinley's direction, Analytical engaged Martin Company to remedy the issue. Botts testified that Analytical suffered losses in the amount of $33,439 because of this product design issue, which included costs related to Martin Company's invoices, in-house costs (including time spent by McKinley working with Martin Company), materials, and warranty.

Vrazel testified in more detail about the HG10 and design issues. She testified that the HG module "will add humidified gas to a calibration gas stream in order to create a variable level of humidity" and "can calibrate monitors that . . . would require or be out in an atmosphere where there's humidity." Vrazel further testified that Analytical's standard HG module is the 5-liter system, and that the 10-liter system includes "an option to allow a higher dilution gas to go into the gas-stream." She explained that the HG module's design was completed in 2012 or 2013, before the execution of the Agreement.

She testified, however, that after the parties entered the Agreement, Analytical was contacted by one of its representatives who sold the HG10 to a customer in the United Kingdom ("UK"). The representative informed Analytical of an issue the customer was having with the instrument. As Vrazel explained, the HG10 "was designed to be automated and allow relative humidity [to be calibrated] on an automated basis." In this instance, Analytical discovered that the automation part of the instrument was not working properly. Vrazel testified that the issue was thought to be related to a software problem.

Vrazel also testified that, shortly after discovering the issue with the HG10, Analytical discovered that four of the 5-liter modules, which had been sold to the United States Air Force, were also not stabilizing well and having the same automation issue. At that point, Analytical "realized that something needed to be

18

done." Analytical engaged Jim McCabe and Martin Company. McCabe was a former employee of Laboratories who was involved with the development of the software and design of the HG modules. He worked for Laboratories from about 2006 until 2011 or 2012, when he went to Martin Company. McCabe helped resolve some of the issues with the HG10, as he "knew all about the instrumentation." According to the invoices submitted by Martin, McCabe completed his work in 2016.

Vrazel admitted during cross-examination that McKinley informed the customer that they should be able to use the HG10 in non-automated mode—"simply flip it from automated to nonautomated"—and "get the requirements that they wanted." She also testified that she did not know if the customer was using the HG10 as designed. Finally, Vrazel testified that the 5-liter system used by the Air Force was different than the HG10 liter module.

Appellants claim that this evidence fails to demonstrate that any alleged defect existed at the time of the Agreement or that the design defect was product wide. We disagree. As noted above, Vrazel testified that the design for the HG10 module was completed in about 2012, before the Agreement was executed. She also testified that Analytical brought in McCabe and Martin Company to resolve the issues with the HG10 once the issues were discovered because McCabe knew the instrumentation and was involved in the development of the software and overall design. Further,

she testified that the problem with the HG10 was believed to be a "software issue." Because the HG10's design was completed around 2012, and because Analytical (at the recommendation of McKinley) chose to bring in a person who was familiar with the overall design and software used in the HG10 to remedy what was believed to be a software issue, the jury reasonably could have inferred that the problem with the HG10 was in fact a flaw in the original design that existed prior to the time of the Agreement in 2014.

Considering the evidence in a light most favorable to the jury's finding and indulging every reasonable inference to support it, we conclude there is legally sufficient evidence to support the award of $33,439 for product design issues. *See City of Keller*, 168 S.W.3d at 827. Likewise, we conclude that the jury's finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust and, therefore, there is factually sufficient evidence to support the award of $33,439 for product design issues. *See Cain*, 709 S.W.2d at 176.

We overrule appellants' fourth issue.

## C.    Failure to Disclose Material Facts

In their fifth issue, appellants contend there was legally and factually insufficient evidence to support the jury's finding that $41,559 would fairly and reasonably compensate Analytical for its damages that resulted from the failure to disclose material facts. Appellants argue that these damages were awarded for

20

"post-Agreement product issues" related to component parts used in manufacturing two Analytical products—Model No. 491 and FlexStream—even though there was insufficient evidence that appellants failed to disclose that these issues existed prior to the Agreement.

McKinley and Laboratories represented and warranted in Article 5(AE) of the Agreement that:

> Full Disclosure. Neither this Agreement nor any certificate, report, statement or other document delivered or to be delivered to [Analytical] by [Laboratories] in connection with the negotiation of this Agreement or consummation of the transactions contemplated hereby contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading.

Botts testified that, despite this representation, significant issues were not disclosed by appellants. First, Botts testified that there was an issue with the touch screen for the FlexStream, which was the "No. 1 selling product" for Analytical. A few months after the Agreement was executed, Analytical discovered that the manufacturer of the touch screen had discontinued the touch screen. Botts testified that he investigated this issue personally, "trying to understand how in the world can [a] supplier discontinue a part they know their customers are using in their products . . . as a surprise." But when Botts contacted the manufacturer, he discovered that the manufacturer had in fact notified their customers. Botts further testified that this was a "known situation" before the parties entered the Agreement,

and ultimately required a redesign of the FlexStream product at an increased cost of $200 per unit. Finally, in total, Analytical presented evidence that it cost $24,946 to resolve the issue related to the FlexStream, which included consultant fees, higher unit costs, and fees related to Analytical employees' time spent addressing this issue.

Appellants point to Botts's testimony that the manufacturer did not discontinue the touch screen until *after* the Agreement was entered into in February 2014 in support of their argument that there is no evidence they failed to disclose an issue that existed at the time of the Agreement. While it is true that Botts testified that Analytical became aware of the issue with the touch screen "a few months after the Asset Purchase Agreement," he also testified that the manufacturer had notified its customers that it was discontinuing the touch screen before doing so. Viewing this testimony in conjunction with Botts's other testimony that the issue with the FlexStream touch screen was a "known situation before the transaction," the jury could have reasonably inferred that the manufacturer informed Laboratories that it was discontinuing the touch screen *before* the parties entered into the Agreement in February 2014, even though the touch screen was not actually discontinued until *after* the Agreement. Accordingly, despite appellants' assertion to the contrary, there was evidence presented that this issue related to the FlexStream touch screen existed before the execution of the Agreement and should have been disclosed.

Botts also testified to an issue with a second product—Kin-Tek Product Model No. 491—that was not disclosed. He testified that Model No. 491 was a heater controller and Analytical's "second most important product in the company at the time." Analytical learned after the Agreement that this product contained obsolete parts, meaning "the supplier of the part[] had already discontinued it." Laboratories had been using replacement parts from "a secondary market source [for] these obsolete parts, [and] had them on a shelf and were using them." Botts testified that Analytical was not informed at the time of the Agreement that the Model No. 491 was "being built with parts that were no longer being produced," but that information "absolutely would have been" important to know. Botts further testified that Analytical incurred $16,613 in costs related to this product, which included consultant fees, material and inventory costs, and costs related to Analytical employees' time spent to resolve this issue. The Model No. 491 was ultimately discontinued because of the discontinued component part, and, because of the part change, it would have required a redesign of the Model No. 491 with new parts for it to continue to be manufactured.

From this evidence—particularly Botts's testimony that Laboratories was obtaining substitute parts for Model No. 491 from a secondary market source—the jury could have reasonably inferred that Laboratories knew at the time of the Agreement that the Model No. 491 was being made with obsolete parts.

Accordingly, despite appellants' assertion to the contrary, there was evidence presented that this issue related to the Model No. 491 existed before the execution of the Agreement and should have been disclosed.

Considering the evidence in a light most favorable to the jury's finding and indulging every reasonable inference to support it, we conclude there is legally sufficient evidence to support the award of $41,559 for the failure to disclose material facts. *See City of Keller*, 168 S.W.3d at 827. Likewise, we conclude that the jury's finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust and, therefore, there is factually sufficient evidence to support the award of $41,559 for the failure to disclose material facts. *See Cain*, 709 S.W.2d at 176.

We overrule appellants' fifth issue.

### D. Obsolete and Malfunctioning Equipment

In their sixth issue, appellants argue that there was legally and factually insufficient evidence to support the jury's finding that $45,985.02 would fairly and reasonably compensate Analytical for its damages that resulted from obsolete or malfunctioning equipment, including a 57-gauge, a dry calibration device, a welder, ground fault testing equipment, and an eyewash station. According to appellants, the evidence does not establish that any of this equipment was obsolete or malfunctioning on the date of the Agreement.

24

McKinley and Laboratories represented and warranted in Article 5(E) of the Agreement that the assets were sufficient to carry on the business:

> Sufficiency of the Assets: The Assets to be sold to [Analytical] hereunder constitute all of the assets used in the Business except for the Excluded Assets, and are sufficient to carry on such Business as carried on by [Laboratories] on or prior to the Closing Date. With the exception of Inventory and Inventory Supplies in transit and [Laboratories'] mobile equipment located at or traveling to or from sites in connection with the performance by [Laboratories] of on-going Contracts, all the tangible assets are situated at [Laboratories'] business address.

Botts testified that there were five pieces of equipment that were malfunctioning or not working at all and that Analytical sought damages for a 57-gauge, a dry calibration device, a welder, ground fault testing equipment, and an eyewash station.

1. *57-gauge*

With respect to the 57-gauge, Botts testified that there were certain parts on the gauge system that did not work, and that Analytical had to purchase replacement parts for those that were not working. Botts testified that the total cost for these parts was $8,154. Botts stated it was his understanding that the 57-gauge was not working at the time of the Agreement, and that this piece of equipment was necessary for Analytical's business.

He admitted on cross-examination that he did not know exactly when the component part of the equipment failed, but that "no one [at Analytical] was made aware of it until after we had done the deal." He explained that he discovered it was not working when he saw an order for a certain product, but the product had not been

25

made or shipped yet. Botts was informed by Mike McKinley, McKinley's son, that the 57-gauge was broken and that they did not have the money to buy a replacement part. Botts disagreed that the 57-gauge broke after the Agreement, testifying that he was informed by "people in the lab" that "it had been broken for a while." In light of this evidence, we disagree with appellants' assertion that there was insufficient evidence that the 57-gauge was not working at the time of the Agreement.

2. *Dry Calibration Device*

The next piece of equipment Botts testified about was the dry calibration device, which is a piece of equipment that is required as a part of the manufacturing process for other Analytical products. Specifically, the dry calibration device is "required to perform the final test of a product confirming that it meets its specifications." Botts testified that, at the time of the Agreement, the dry calibration device "apparently . . . did not work." Further, Botts testified that he was "told [the dry calibration device] had not been working." Analytical introduced an exhibit, dated five days after the Agreement, for a replacement dry calibration device, the cost of which was $7,800. Botts testified that this was not a cost that Analytical anticipated incurring at the time of the Agreement. Despite appellants' assertion to the contrary, there was evidence introduced that the dry calibration device was not working at the time of the Agreement.

3. *Welder*

The third piece of malfunctioning equipment about which Botts testified was a welder, which is a "welding machine that is used to weld certain parts in the Kin-Tek [Analytical] product line." But the welder that Analytical had "did not work." Botts testified that Analytical incurred costs of $27,394 to rent a welder on two different occasions (once in 2016 and once in 2018) and then purchase a new welder (in 2019). These costs were not anticipated by Analytical at the time it entered into the Agreement.

On cross-examination, Botts testified that Analytical discovered the welder did not work "several months after the [Agreement]." He admitted he did not know whether the welder was working on the day of the Agreement. He explained, "The welder was only used when we had a certain piece of equipment on order . . . from customers," and there had not been "a piece of that equipment purchased for a while." He also testified that "the historical trend of the sales of the product that's welded . . . [was] only a few a year," which was "one of the reasons it was not evident that this welder did not work" until 2016, after the Agreement.

Appellants argue that this testimony shows that "the welder must have been working at least through November 2016 to handle those few times a year welding needs to which Botts testified." We disagree. Botts did not testify that the product that required the welder had in fact been purchased in 2014 or 2015, only that there

had not been "a piece of that equipment purchased for awhile." He further explained that because this piece of equipment was not purchased often, this was one of the reasons Analytical did not discover that the welder was not working until 2016. From this, the jury reasonably could have inferred that the welder was not working at the time of the Agreement.

4. *Ground Fault Test Equipment*

The next piece of equipment about which Botts testified was the ground fault test equipment. Botts testified that this device "tests an electrical property of a piece of equipment[ ] and . . . ensures that the equipment is grounded." He explained that an electrical test is required for products with a "CE certification," which is an "European certification mark that has to be put on equipment when you sell into Europe." "[S]ome time after the [Agreement,]" Analytical discovered that the test was not being performed because "the piece of equipment . . . doing the test . . . had failed and had been put on the shelf and been sitting there and everybody ignored it." Botts testified that he believed the ground fault testing device had been broken for "over a year and had been put on the shelf and unused."

On cross-examination, Botts further testified that he learned there was a problem with the ground fault test equipment two years after the Agreement. Botts testified that he was told that this piece of equipment was left by a UK sales representative, but that it had never worked and, therefore, Laboratories had never

performed the required electrical test. Botts confirmed that Laboratories was not performing the electrical test at the time of the Agreement. He further stated that Laboratories was not in compliance with the CE Certification because it was not performing the electrical test, despite putting the certification mark on the equipment. He knew that Laboratories was not in compliance because they were not performing the electrical test because the ground fault testing equipment did not work, and Botts was told by Laboratories employees that the electrical test was not being performed.

Appellants contend that because the issue with the ground fault test equipment did not come to light until two years after the Agreement, and because Botts testified he did not ask questions about the equipment until after the Agreement, "one can only assume that Analytical never bothered checking to see if [the] equipment was functional . . . at the time of the Agreement." We disagree. The above evidence shows that: (1) though Laboratories had this testing equipment, it never worked; (2) Laboratories never performed the ground fault test; and (3) Laboratories was not performing this required test at the time of the Agreement. From this evidence, the jury could have reasonably concluded that the ground fault testing equipment was not working at the time of the Agreement.

29

5. *Eyewash Station*

The final piece of equipment about which Botts testified was the eyewash station. Botts testified that a chemical laboratory is required to have certain safety devices, one of which is an eyewash station where employees can wash their eyes in the event chemical vapor is released into the air. Botts testified that although Laboratories had an eyewash station, it did not work. Botts testified that the eyewash station was "necessary for safety" and that, in his mind, he "wouldn't run a business without it." The eyewash station cost $837.50 to replace in September 2015. Botts testified that Analytical was not aware that the eyewash station was broken when it purchased Laboratories' assets.

Appellants argue that this evidence "does not mean that the eyewash station was in fact broken at all." They argue again that "one can only assume that Analytical never bothered checking to see if [the] equipment was functional . . . at the time of the Agreement." We disagree. Botts explicitly testified that the eyewash station did not work. The jury could have reasonably inferred from this testimony, combined with his testimony that Analytical did not know it was broken at the time of purchase (i.e., the Agreement), that the eyewash station was in fact broken at the time of the Agreement.

Considering the evidence in a light most favorable to the jury's finding and indulging every reasonable inference to support it, we conclude there is legally

sufficient evidence to support the award of $45,985.02 for obsolete or malfunctioning equipment. *See City of Keller*, 168 S.W.3d at 827. Likewise, we conclude that the jury's finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust and, therefore, there is factually sufficient evidence to support the award of $45,985.02 for obsolete or malfunctioning equipment. *See Cain*, 709 S.W.2d at 176.

We overrule appellants' sixth issue.

**E.    Failure to Remove Hazardous Materials**

In their seventh issue, appellants argue that there is legally and factually insufficient evidence to support the jury's finding that $10,500 would fairly and reasonably compensate Analytical for its damages that resulted from the failure to remove hazardous materials.

Laboratories represented in Article 8(E) of the Agreement that it would dispose of certain chemicals and other materials:

> Sublease. Pursuant to the Sublease Agreement in Exhibit I, [Laboratories] who is the Sublessor in such agreement, agrees to make disposition of certain chemicals, expired permeation tubes, canisters, and other materials identified by a label marked "Waste" and for safety reasons located in designated places on Leased Premises as follows: expired permeation tubes and one (1) chlorine gas canister having a corroded valve on the gated patio outside the lab area; expired chemical raw materials, generally in glass bottles, in the chemical storage room atop the chemical storage cabinets; and 3 empty gas canisters on the floor of the chemical room. Such obligations of Sublessor are specifically not assumed by Sublessee. Such Disposal will be completed within 90 days from the effective date of the sublease.

31

Question 3 of the trial court's charge to the jury asked the jury to consider whether to award damages to Analytical as a result of its "[l]osses arising from failure to remove hazardous materials, if any." Appellants contend that the evidence presented "does not establish that the subject materials were hazardous needing some outside company's expertise to handle the disposal" and, therefore, there is insufficient evidence supporting the jury's damage award.

The jury charge did not define "hazardous materials," and appellants did not object to the lack of a definition. Thus, here, we must measure the sufficiency of the charge against the commonly understood meaning of "hazardous materials." *See Nowlin v. Keaton*, No. 01-17-00523-CV, 2019 WL 1996483, at *25 (Tex. App.—Houston [1st Dist.] May 7, 2019, no pet.) (mem. op.) (considering sufficiency of evidence in light of commonly understood meaning of "keyless dead bolt" because jury charge did not define the term and parties did not object to lack of definition); *Fenner v. Samson Res. Co.*, No. 01-03-00049-CV, 2005 WL 2123043, at *3 (Tex. App.—Houston [1st Dist.] Aug. 31, 2005, pet. denied) (construing "surface" according to its plain and ordinary meaning where neither parties' agreement nor jury charge defined the term); *see also Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (holding, when no objection is made to jury charge, sufficiency of evidence is measured against charge given rather than some other unidentified law). "Hazardous" is defined in Merriam-Webster's Collegiate Dictionary as "involving

or exposing one to risk (as of loss or harm)." *Hazardous*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY, (11th ed. 2020).

Botts testified that as part of the Agreement, Laboratories agreed to remove certain chemicals from the property and did remove some of those chemicals. After the Agreement was signed, however, as new employees came in to work for Analytical, they discovered additional chemicals needing disposal. These chemicals were present on the property at the time of the Agreement and were manufactured or purchased well before the Agreement. Botts testified that Analytical received a bid to dispose of these chemicals from Clean Harbor for $10,500, and this amount was reflected on Analytical's exhibit detailing its damages for "Hazardous chemicals disposal."

Vrazel, whose education and background is in chemistry and who had worked for Laboratories since 2001, testified in detail about the specific chemicals for which Analytical sought damages. She testified that there were a handful of chemicals that need to be disposed of that remain at Analytical, which are kept in a chemical storage room, and that were present at the time of the Agreement. The chemicals included "an actual gas cylinder of pure arsine," which was a "very old cylinder," as well as cylinders of phosphine, chlorine, and hexafluorine. Vrazel testified that the hexaflourine cylinder expired in April of 1995.

Vrazel also testified that, in addition to the cylinders, there were a number of permeation tubes stored in the chemical room that were "very old, contaminated, particulates inside, corroded, or degraded, obsolete and defective[.]" A number of these permeation tubes had calibration dates of 2004. Vrazel testified that there were around 245 to 250 permeation tubes that have not been disposed of but cannot simply be thrown away with chemicals still inside because "the different type of chemicals would require a different type of neutralization or disposal process."

Vrazel stated that although an Analytical technician could probably neutralize and dispose of some of the permeation tubes, disposing of others would require that certain disposal procedures be followed, and it would take time and effort to research the requirements for each different chemical. Vrazel contacted a vendor, Clean Harbor, whose business is to "dispose of chemicals and clean up the environment, [and] do different things with environmental hazards." Vrazel testified that Analytical received a quote from Clean Harbor for $10,000 or $10,500 to pick up and properly dispose of the chemicals and tubes.

On cross-examination, Vrazel admitted that one of the chemicals—hexafluorine—was classified as nonhazardous on the safety data sheet and presented "no danger to the environment." She explained, however, that these statements were referred to the transportation of hexafluorine, and not the disposal. And although the safety data sheet indicated that there were "[n]o specific disposal measures for the

nonhazardous aqueous solution," Vrazel did not believe that Analytical's employees "know how to dispose of an actual cylinder," but that Clean Harbor likely does, as "[t]hat's what their business is."

Based on the testimony and evidence presented that it was not just the chemicals but the cylinders and permeation tubes that needed to be properly disposed of—items which were described as "very old, contaminated, . . . corroded, or degraded, . . . and defective"—and that these chemicals and their containers cannot simply be thrown away, but must be neutralized first, the jury reasonably could have determined that the chemicals and their respective containers were "hazardous materials," i.e., posed some risk of loss or harm.

Considering the evidence in a light most favorable to the jury's finding and indulging every reasonable inference to support it, we conclude there is legally sufficient evidence to support the award of $10,500 for failure to remove hazardous materials. *See City of Keller*, 168 S.W.3d at 827. Likewise, we conclude that the jury's finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust and, therefore, there is factually sufficient evidence to support the award of $10,500 for failure to remove hazardous materials. *See Cain*, 709 S.W.2d at 176.

We overrule appellants' seventh issue.

## Fraud Claims

In their eighth and ninth issues, appellants argue that Analytical's fraudulent inducement claim is barred as a matter of law and, if the only remaining claim is the fraudulent inducement claim, the attorney's-fee award is unsupportable. Analytical responds that these issues are moot because it "chose not to pursue its fraudulent inducement claim, the jury was not asked about it, and it was not incorporated into the final judgment." We agree with Analytical that these issues on appeal identify no error in the trial court's judgment and, thus, present nothing for our review.

In the trial court's jury charge, the jury was asked only two liability questions. Question 1 asked: "Did McKinley fail to comply with the Agreement?" And Question 2 asked: "Did Laboratories fail to comply with the Agreement?" These liability questions are taken directly from the Texas Pattern Jury Charge ("PJC") for Breach of Contract. *See* TEXAS PATTERN JURY CHARGES: BUSINESS, CONSUMER, INSURANCE & EMPLOYMENT § 101.2. Question 3 then asked the jury "[w]hat sum of money, if any, if paid now in cash, would fairly and reasonably compensate Analytical for its damages, if any, that resulted from such failure to comply?" This too is identical to the PJC Question on Contract Damages. *Id.* § 115.3. The only other question related to the amount of attorney's fees to be awarded; there was no question in the charge related to Analytical's fraudulent inducement claim. *See, e.g., id.* §§ 105.1, 105.2. Furthermore, the trial court's judgment awards Analytical

"$274,134.41 in actual damages for the amounts awarded by the jury in its answers to Question No. 3."

Because Analytical's fraudulent inducement claim was not submitted to the jury and, therefore, the jury returned no findings and the trial court rendered no judgment on this claim, appellants eighth and ninth issues relating to this claim present nothing for our review. We overrule appellants' eighth and ninth issues.

## Conclusion

We affirm the judgment of the trial court.


Amparo Guerra
Justice

Panel consists of Justices Countiss, Rivas-Molloy, and Guerra.

37